**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Michelle Nelson,                                         Civil No. 06-1313 (DWF/AJB)

            Plaintiff,

v.                                                             **MEMORANDUM**
                                                                   **OPINION AND ORDER**

Anoka LLC, formerly known as
F. Dohmen Company,

            Defendant.

_____

James T. Hansing, Esq., Hansing Law Office, counsel for Plaintiff.

Katherine C. Bischoff, Esq., and Thomas E. Marshall, Esq., Jackson Lewis, counsel for Defendant.

_____

       This matter is before the Court pursuant to a Motion for Summary Judgment brought by Defendant Anoka LLC ("Anoka") and pursuant to a Motion for Summary Judgment brought by Plaintiff Michelle Nelson.[1]  In her Complaint, Nelson raises causes of action for breach of contract and promissory estoppel.  For the reasons stated below. Anoka's Motion for Summary Judgment is granted; Nelson's Motion for Summary Judgment is denied.

---

[1] Also before the Court is Anoka's Motion to Strike Plaintiff's Motion for Summary Judgment (Doc. No. 25).  Anoka's Motion to Strike is denied.

**BACKGROUND**

At all times relevant to this matter, Anoka was a pharmaceutical wholesaler owned by the F. Dohmen Company and operating in Anoka, Minnesota.  The facts that give rise to this matter relate to Nelson's promotion at Anoka from warehouse employee to supervisor, and then her ultimate termination for violating Anoka's anti-harassment policy.

Nelson began working in Anoka's warehouse in September 1997 as a warehouse employee.  Warehouse employees were represented by Teamsters Local No. 638.  The union had a collective-bargaining agreement with Anoka that included a grievance-arbitration clause and a provision that allowed Anoka to discipline or dismiss an employee where just cause existed.  (Decl. of James T. Hansing ("Hansing Decl.") at ¶ 3, Ex. B2, §§ VII and VIII.)  While she was employed as a warehouse employee, Nelson undisputedly was covered by the collective bargaining agreement.

In February 2004, Mike Herkal, Anoka's Operations Manager and Nelson's supervisor, approached Nelson and offered her the new position of warehouse supervisor.  Initially, Nelson refused the position, stating that as a supervisor she would leave the bargaining unit and the protections that went with it.  However, several months later, Herkal offered the position to Nelson again.  Nelson discussed the position with her husband and later spoke to Herkal about her concerns.  Herkal offered to make Nelson's position more secure with a written agreement.  According to Nelson, Herkal drafted the agreement on his office word processor and showed it to Nelson on the computer before she actually agreed to it.  The Written Agreement read as follows:

> We agree that should either party, for any reason, decide that Michelle Nelson's Supervisor position is not working, that Michelle will return to the warehouse. She will return on nights at the top of the pay scale, including shift differential (currently $.34) but will be at the bottom of the seniority list. Also, she will be entitled to all appropriate pay increases.

(Affidavit of Katherine C. Bischoff ("Bischoff Aff.") Ex. 5.) The Written Agreement was signed by Herkal (on behalf of Anoka) and Nelson on August 12, 2004, after Nelson began her position of warehouse supervisor. (Bischoff Aff. Ex. 5.)

On August 9, 2004, Anoka promoted Nelson to warehouse supervisor and Nelson began her new job. On the same day she began her new position, the human resources coordinator provided Nelson with a letter confirming her promotion and setting out her new salary and benefits. That letter stated:

> Please be advised that your employment with the F. Dohmen Company or any of it's [sic] subsidiaries is and will be at-will and that this letter does not constitute a contract of employment nor guarantee employment for any given period of time. Either you or the Company may terminate your employment at any time for any reason with or without cause and/or with or without notice to the extent permitted by law.

(Bischoff Aff. Ex. 17 at 2.)

It is undisputed that Anoka's anti-harassment policy applied to Nelson both in her positions as warehouse worker and as supervisor. Anoka's anti-harassment policy stated, in part, as follows:

> The F. Dohmen Co. has a policy of zero tolerance for any type of harassment including sexual harassment, harassment based on sex or gender, race, color, creed, religion, national origin, disability, handicap, sexual orientation, covered veteran status, ancestry, or status with regard to public assistance.

(Bischoff Aff. Ex. 16.) The anti-harassment policy stated that in the event of a violation

3

of the policy "[a]ppropriate discipline will be imposed ranging from a verbal warning up to and including termination, even for a first offense." (*Id.*)  The anti-harassment policy applied to all employees. (*Id.*)  Examples of conduct considered to violate the anti-harassment policy included:  (1) offensive or unwelcome sexual conversation including jokes or teasing; (2) offensive comments or suggestive gestures including leering; (3) the display of sexually explicit or implicit messages; and (4) forwarding sexually graphic materials, cartoons, jokes of a sexual nature or about any protected group via e-mail, voice mail or internet through the Company e-mail or other electronic communication device. (*Id.* at 5.)  Undisputedly, Nelson acknowledged receipt of copies of the policy and agreed to comply with them. (*Id.* at Ex. 10.)  Nelson also attended anti-harassment training in February 1999, February 2001, and April 2005.

In April 2005, Nelson forwarded two e-mails to subordinates that she had received from her husband.  (Bischoff Aff. Exs. 20, 21.)  One of the e-mails depicted individuals who purportedly had drunk too much alcohol, including a passed-out woman wearing only thong underwear and surrounded by beer bottles, an unconscious man with a tampon in his mouth, and a naked buttocks with a face painted on it and a cigarette lodged in the anus, as if it were a mouth.  Nelson forwarded the e-mail to two of her male subordinates.  The second e-mail was entitled "Why Women Have 2 Hands – Why Men Have 2 Hands."  It included two photos of children—the first was a young female with a phone in one hand and a credit card in the other; the second was a nude boy holding a remote control in one hand and his penis in the other.  Nelson admittedly forwarded this e-mail to the same two male subordinates and also to three other subordinates.

4

Weeks later, upon learning that Nelson had sent these e-mails, Anoka managers directed Herkal to speak to Nelson about these e-mails. Nelson recalls Herkal telling her "don't do it again." (Nelson Dep. at 169.)

In May 2005, just before the Minnesota fishing opener, Nelson sent an e-mail to Anoka's Minnesota Operations, a group that included her subordinates, that included the statement, "Out on time, have a fabulous fishing weekend. For those who don't well entertain your selves some how." (Bischoff Aff. Ex. 23.) After Nelson sent the e-mail, Diane Haugen, Anoka's Human Resources Coordinator, met with Nelson and explained that the message "could be taken in different ways by different people." (*Id*.) Haugen told Nelson that the e-mail was inappropriate and instructed Nelson to "read through her memo's [sic] carefully before sending them out to make sure it [sic] reads appropriately." (*Id*.)

On August 31, 2005, Nelson received an e-mail from her husband that had attached photographs of female bodybuilders in bikinis. One photograph in the series showed a nude, obese woman on her hands and knees on a bed under a caption of "what happens when they stop working out." (Nelson Dep. at 174; Ex. 24.) Nelson was viewing the photos when Tony Wesley, a warehouse worker and Nelson's subordinate, walked into Nelson's office. Nelson showed the picture of the nude, obese woman to Wesley and stated, "How would you like this for a date?" (Nelson Dep. 172-73.) Nelson testified that Wesley "just kind of looked and shook his head and said I don't think so." (*Id*. at 177.) Then, Wesley left the office.

5

Later that day, Nelson showed the photograph to Karen Haverty, her new supervisor, and explained what had happened with Wesley. Haverty told Nelson that what Nelson had done was not a good idea. Nelson then apologized to Wesley, stating that she thought the photo was funny. (*Id*. at 180.)

The next day, Wesley and his union steward reported the incident to Diane Haugen.[2] The following day, September 2, 2005, Nelson was handed a disciplinary notice summarizing her termination for harassment and gross misconduct. The notice stated:

> Shelly told a male employee she had a date for him and showed him an email picture of a large naked woman on a bed. Shelly did share with me what she had done and expressed to me that she probably should not have done that. . . . The F. Dohmen Co. has zero tolerance for this type of behavior. These offensive and unwelcome pictures are considered harassment and gross misconduct.

(Bischoff Aff. Ex. 3.) Nelson raised the issue of the Written Agreement but was told that the company did not have to honor it.

Nelson initially refused to abide by the company's termination of her, asserting that the Written Agreement applied and that per the agreement, she would be reporting for a night-shift warehouse position. Later, after Allan Lueck, Anoka's general manager,

---

[2] Nelson suggests that Wesley complained about the incident in an effort to retaliate against Nelson for having written Wesley up for disciplinary reasons on two previous occasions. However, the Court sees no relevance to these assertions. Wesley played no part in determining whether Nelson's conduct objectively violated Anoka's anti-harassment policy, and thus Wesley was not a factor in Nelson's termination. Moreover, Nelson has raised no claim of retaliatory discharge and the facts at issue here do not lead to such a claim.

spoke with Anoka's corporate headquarters to clarify Nelson's status, Lueck called Nelson and explained to her that the termination was final.

## DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole that are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record, which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Nelson's action alleges that the parties contract—i.e., the Written Agreement of August 12, 2004—allowed Nelson to return to her position as a warehouse employee if

7

"for any reason" her position as a supervisor did not work out.  Nelson admits that the Written Agreement did not give her the ability to violate Anoka's policies (Nelson Dep. at 119), yet Nelson contends that the language "for any reason" in the Written Agreement encompassed virtually anything, including Nelson's conduct of sharing with her employee an e-mail that depicted an obese, nude woman.  Thus, Nelson asserts that Anoka breached its contract with her by failing to allow her to return to her position of supervisor.

Assuming that the written agreement of August 12, 2004, created a contract between Nelson and Anoka, the Court finds that the Written Agreement could not be construed in a way to cover the circumstances at issue here and thus authorize Nelson's behavior.  Indeed, Nelson concedes that the Written Agreement did not exempt her from Anoka's anti-harassment policy.  In the Court's view, no enforceable contract could be created, and no enforceable promise could occur, that would allow Nelson to commit sexual harassment.  Anoka determined that Nelson's conduct violated Anoka's anti-harassment policy, and the Court will not second-guess Anoka's business decision. *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 854 (8th Cir. 2005) ("the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.") (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)).  Anoka's Motion for Summary Judgment is granted.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment (Doc. No. 25) is **DENIED**.

2. Defendant's Motion for Summary Judgment (Doc. No. 13) is **GRANTED**.

3. The Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

4. Plaintiff's Motion for Summary Judgment (Doc. No. 20) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  May 21, 2007					s/Donovan W. Frank
							DONOVAN W. FRANK
							Judge of United States District Court